# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/30/18

Multidistrict Litigation No. 11-md-2296 (RJS)
Master Case File No. 12-mc-2296 (RJS)
No. 12-cv-2652 (RJS)
No. 13-cv-3736 (RJS)
No. 13-cv-3737 (RJS)
No. 13-cv-3738 (RJS)
No. 13-cv-3739 (RJS)
No. 13-cv-3740 (RJS)
No. 13-cv-3741 (RJS)
No. 13-cv-3742 (RJS)
No. 13-cv-3743 (RJS)
No. 13-cv-3744 (RJS)
No. 13-cv-3745 (RJS)
No. 13-cv-3746 (RJS)
No. 13-cv-3747 (RJS)
No. 13-cv-3748 (RJS)
No. 13-cv-3749 (RJS)
No. 13-cv-3750 (RJS)
No. 13-cv-3751 (RJS)
No. 13-cv-3752 (RJS)
No. 13-cv-3753 (RJS)

IN RE TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION

MARC S. KIRSCHNER, AS LITIGATION TRUSTEE FOR THE
TRIBUNE LITIGATION TRUST,

Plaintiff,

VERSUS

DENNIS J. FITZSIMONS *et al.*,

Defendants.

OPINION AND ORDER
November 30, 2018

RICHARD J. SULLIVAN, Circuit Judge:

This is the third Opinion and Order issued by this Court resolving claims arising out of the 2007 leveraged buyout ("LBO") of the Tribune Company ("Tribune" or the "Company") and its subsequent 2008 bankruptcy. The multidistrict litigation ("MDL") in which these claims arise includes several actions brought by Tribune's litigation trustee, Marc Kirschner (the "Trustee"), in which he seeks to recover assets for Tribune's creditors. Now before the Court are five motions to dismiss claims asserted against various individuals and entities who were involved in, and/or received payments following, the LBO transaction. (11-md-2296, Doc. Nos. 5939, 5938, 5942, 5933, 5928.) The relevant claims are asserted in several complaints, including those filed in (1) *Kirschner v. FitzSimons*, No. 12-cv-2652 (the "*FitzSimons* Complaint") and (2) eighteen tag-along actions, Nos. 13-cv-3736 through 13-cv-3753 (the "Tag-Along Complaints").[1] For the reasons set forth below, all five motions are GRANTED.

---

[1] The eighteen Tag-Along Defendants are: Brian Litman, Irene M. F. Sewell, Joseph A. Young, Patrick Shanahan, Gary Weitman, Betty Ellen Berlamino, David P. Murphy, Tom E. Ehlmann, John F. Poelking, Pamela S. Pearson, James L. Ellis, Marc Schacher, Vincent R. Giannini, William P. Shaw, Peter A. Knapp, John R. Hendricks, Vincent A. Malcolm, and Gina M. Mazzaferri.

## I. BACKGROUND

### A. Facts[2]

Prior to filing for bankruptcy in 2008, Tribune was "America's largest media and entertainment company," owning numerous radio and television stations and major newspapers, including the *Chicago Tribune* and the *Los Angeles Times*. (*FitzSimons* Compl. ¶ 116.) However, in the years preceding the 2007 LBO, the newspaper publishing business – which made up approximately 75% of Tribune's revenues – experienced a consistent decline in circulation and profits. (*Id.* ¶¶ 122–23.) In fact, Tribune experienced shrinking profits even more acutely than the industry as a whole. (*Id.* ¶ 125.) Accordingly, in 2005, the Company began a strategic review of its businesses, and, in May of 2006, it entered into a leveraged recapitalization transaction. (*Id.* ¶ 126–27.)

---

[2] The following facts are taken from the Fifth Amended Complaint (Doc. No. 2701 ("*FitzSimons* Complaint" or "*FitzSimons* Compl.")), and are presumed to be true for the purposes of this motion, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the relevant motions, the Court has also considered the moving Defendants' memoranda of law (Doc. No. 5941 ("Motion 3")), (Doc. No. 5940 ("Motion 4")), (Doc. No. 5944 ("Motion 5")), (Doc. No. 6020 ("Motion 6"), and Doc. No. 6017 ("Motion 7")), the Trustee's opposition (Doc. No. 6137 ("Opp'n")), the moving Defendants' replies (Doc. No. 6195 ("Motion 3 Reply")), (Doc. No. 6208 ("Motion 4 Reply")), (Doc. No. 6200 ("Motion 5 Reply")), (Doc No. 6186 ("Motion 6 Reply")), and Doc. No. 6184 ("Motion 7 Reply")), and all exhibits and declarations attached thereto. In addition, unless otherwise noted, all docket numbers refer to case number 11-md-2296.

Following the May 2006 transaction, 33% of Tribune stock was held by two constellations of family trusts and foundations – (1) the Chandler Trusts, which owned 20% of Tribune stock, and (2) the Robert R. McCormick Foundation ("McCormick Foundation") and the Cantigny Foundation (together with the McCormick Foundation, the "Foundations"), which collectively owned approximately 13% of Tribune stock. (*Id.*) Tribune had an eleven-member board of directors (the "Board"), which was chaired by Tribune's President and Chief Executive Officer ("CEO"), Dennis FitzSimons, who also served as Chairman of the McCormick Foundation and a board member of the Cantigny Foundation. (*Id.* ¶¶ 27, 38.) The Board also included three trustees and/or beneficiaries of the Chandler Trusts – Jeffrey Chandler, Roger Goodan, and William Stinehart Jr. (the "Chandler Directors"). (*Id.* ¶¶ 35–37.) Finally, the Board included seven independent members who neither served as Tribune officers nor were affiliated with the Chandler Trusts or the Foundations (the "Independent Directors") – Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, and Miles D. White. (*Id.* ¶¶ 28–34, 39.)

In June of 2006 – soon after the leveraged recapitalization transaction – Stinehart, acting in his capacity as the trustee of the Chandler Trusts, wrote to the Board expressing dismay over the Company's deteriorating business. (*Id.*

¶ 129.) In response to Tribune's troubling economic realities, Stinehart "demanded" that a special committee of independent directors be formed to "take prompt decisive action to enhance stockholder value." (*Id.* ¶ 130.) Accordingly, in September of 2006, the Board announced the formation of a special committee (the "Special Committee"), which was composed of the seven Independent Directors. (*Id.* ¶ 136.)

In January 2007, private-equity investor Sam Zell emerged as a bidder for Tribune (*Id.* ¶ 145), and, on February 2, 2007, Zell – in association with Equity Group Investments ("EGI"), a company in which he owned a controlling interest – proposed that EGI-TRB, an affiliate of EGI, buy all of Tribune's outstanding stock pursuant to a merger. (*Id.* ¶¶ 76–78, 145–46). Over the course of the next several weeks, Zell negotiated his proposal with Tribune and the Special Committee, which sought the views of the Chandler Trusts and the Foundations on a number of occasions. (*Id.* ¶¶ 147–51.) Zell and EGI also negotiated directly with the Chandler Trusts. (*Id.* ¶ 151.) Throughout these negotiations, Morgan Stanley advised the Special Committee, and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Citigroup Global Markets, Inc. ("Citigroup") advised the Board as a whole. (*Id.* ¶¶ 14–15, 90, 92, 127, 137, 155–56, 167, 336–38.)

Meanwhile, Tribune Officers Chandler Bigelow, Donald Grenesko, and Daniel

Kazan[3] prepared projections forecasting Tribune's financial health through 2011 (the "February Projections") while simultaneously "negotiat[ing] with Zell over the amount of the special money incentives they would receive if the LBO was consummated." (*Id.* ¶¶ 170–74.)

Ultimately, Zell and EGI submitted a revised proposal whereby Tribune would enter into a two-step LBO transaction. (*Id.* ¶¶ 119, 150.) In the first step ("Step One"), Tribune would borrow approximately $7 billion and execute a tender offer, purchasing about 50% of Tribune's outstanding shares at $34 per share. (*Id.* ¶ 211.) In the second step ("Step Two"), Tribune would borrow another $3.7 billion, purchase its remaining shares, and merge with the newly formed Tribune Employee Stock Ownership Plan ("ESOP"). (*Id.* ¶ 211.) At the conclusion of the LBO, Tribune would become a private company, wholly owned by the ESOP. (*Id.* ¶ 355.) Zell's proposal also included financial benefits that would be awarded to the Officer Defendants, and to the officers and directors of Tribune's subsidiaries, if the LBO was consummated. (*Id.* ¶¶ 158–63; *see also id.* ¶¶ 49, 71.)

As the deal with Zell was being negotiated, Tribune hired additional financial advisors to perform various roles necessary to ensure a successful transaction.

On February 13, 2007, the Board hired accounting firm Duff & Phelps to provide a solvency opinion for the LBO.[4] (*Id.* ¶ 176.) And on February 26, 2007, the Board hired GreatBanc Trust Company ("GreatBanc") to serve as trustee of the ESOP and to evaluate the LBO transaction on the ESOP's behalf. (*Id.* ¶ 177.) Duff & Phelps also agreed to provide a separate, but substantially identical, solvency opinion to GreatBanc to assist it in assessing the LBO. (*Id.* ¶¶ 178–79.)

By March 28, 2007, however, Duff & Phelps advised the Board that it could not provide an opinion as to Tribune's post-LBO solvency unless it incorporated what the Duff & Phelps team considered an impermissible consideration: $1 billion in tax savings that Tribune expected would result from converting the Company into a subchapter S corporation following the LBO. (*Id.* ¶¶ 180–82, 185, 187.) Accordingly, the Board terminated Duff & Phelps' engagement to issue a solvency

---

[3] The *FitzSimons* Complaint refers to Bigelow, Grenesko, and Kazan – together with Mark Hianik, Crane Kenney, and Harry Amsden – as the "Officer Defendants." (*FitzSimons* Compl. ¶¶ 41–47.)

[4] According to the *FitzSimons* Complaint, "[a] 'solvency opinion' is a recognized and commonly used vehicle in leveraged transactions to provide assurances to lenders, the borrower (*i.e.*, the target company itself)[,] and other participants that the company will not fail after and as a result of the transaction, and that the transaction will not effect a fraudulent conveyance." (*FitzSimons* Compl. ¶ 175.) The Trustee alleges that solvency opinions are "[t]ypically rendered by a reputable, independent financial advisory firm, . . . [are] the result of a standardized, legally condoned methodology that is designed to test whether a company will be able to survive under the weight of the additional leverage it intends to incur[,] . . . [and are] generally a prerequisite to any leveraged transaction on the scale of the Tribune LBO . . . ." (*Id.*)

opinion. (*Id.* ¶ 187.) Nevertheless, on April 1, 2007, Duff & Phelps issued a "viability opinion" for GreatBanc's benefit, in which it concluded that "the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis" and that Tribune "would be able to pay its debts as they became due." (*Id.* ¶¶ 188–89, 193.) According to the Trustee, this opinion was "the equivalent of a solvency opinion," with the exception that it took Tribune's expected tax savings into account. (*Id.* ¶ 189.)

On April 1, 2007, the same day Duff & Phelps produced its viability opinion for GreatBanc, GreatBanc's ESOP Committee approved the LBO. (*Id.* ¶ 193.) Also on that day, the Special Committee unanimously recommended that the Board approve the LBO. (*Id.* ¶ 211.) Accordingly, a majority of the Board – that is, six of the Independent Directors and FitzSimons – voted to approve the transaction. (*Id.*) Dudley S. Taft, the seventh Independent Director, was absent at the time of the vote, and the Chandler Directors abstained; however, no director casted a dissenting vote. (*Id.*) Tribune then executed a voting agreement and registration rights agreement with the Chandler Trusts in which the Trusts agreed to vote their shares in favor of the LBO in exchange for preferential registration rights. (*Id.* ¶ 204.) This agreement "virtually guaranteed shareholder approval for the LBO." (*Id.* ¶ 205.) On April 2, 2007, Tribune publicly announced that it had agreed to Zell and EGI's proposal. (*Id.* ¶ 226.)

Knowing that a solvency opinion would be required before the transaction could close, and in light of the fact that Duff & Phelps had declined to produce such an opinion, Tribune management began soliciting bids from other valuation firms. (*Id.* ¶¶ 197–98.) On April 11, 2007, Tribune formally engaged Defendant Valuation Research Corporation ("VRC") – a "lesser known solvency opinion firm" – to provide two solvency opinions that would be presented to the Board prior to the consummation of each step of the LBO. (*Id.* ¶¶ 198, 201.) VRC's engagement letter provided that it would rely on a definition of fair value that included Tribune's expected tax savings. (*Id.* ¶ 201.)

On April 23, 2007, EGI-TRB made a $250 million investment in Tribune in exchange for nearly 1.5 million shares and a $200 million promissory note, payable at Step Two of the LBO. (*Id.* ¶ 228.) Thereafter, on May 9, 2007, Zell was appointed as a member of Tribune's Board. (*Id.* ¶ 227.) Finally, on May 24, 2007, VRC rendered its Step One solvency opinion, partially relying on the February Projections in vouching for Tribune's financial health after Step One. (*Id.* ¶¶ 274–79.) On June 4, 2007, Tribune Officers Grenesko and Bigelow delivered certificates to the major banks that would be funding the LBO attesting that Tribune was "solvent as of that date." (*Id.* ¶ 273.) That same day, the directors and officers of Tribune's subsidiaries agreed to guarantee the LBO debt against the subsidiaries' assets (*id.* ¶ 282), and Step One of the LBO closed

(*id.* ¶ 287). Upon the close of Step One, the Chandler Directors left the Tribune Board. (*Id.* ¶¶ 35–37.)

In October of 2007, in advance of Step Two of the LBO, the Officer Defendants revised the February Projections, lowering Tribune's expected financial performance for the 2007 calendar year but raising predictions for Tribune's subsequent growth rate over the next five years (the "October Projections"). (*Id.* ¶ 306.) VRC used these projections in completing its Step Two solvency opinion. (*Id.* ¶ 320.) Over the next few months, Morgan Stanley, the Board's advisor on the transaction, met several times with the Board to discuss the solvency opinion. (*Id.* ¶ 338.) And on December 4, 2007, VRC met with the Board and gave a "comprehensive presentation" regarding VRC's Step Two solvency analysis and opinion. (*Id.*) Finally, on December 18, 2007, the Special Committee recommended that the Board rely on VRC's Step Two solvency opinion and effectuate Step Two of the LBO. (*Id.* ¶ 326.) The Board did not hold an additional vote as to whether Tribune should proceed with Step Two (*id.*); nevertheless, on December 20, 2007, the directors and officers of Tribune's subsidiaries guaranteed the additional debt necessary for Step Two (*id.* ¶ 329) and the Company completed Step Two, repurchasing its remaining 119 million shares of common stock at $34 per share (*id.* ¶ 353). As anticipated, at the close of Step Two, Tribune – now a private company – carried a debt burden of $13.7 billion. (*Id.* ¶ 354.)

Following Step Two, Zell was named President, CEO, and Chairman of the Tribune Board. (*Id.* ¶ 356.) However, soon after the LBO was completed, Tribune experienced financial difficulties. Specifically, between 2007 and 2008, the Company did not meet the projected growth rate that management had forecasted in the October Projections, and it experienced significant declines in advertising revenue that made it difficult to service its new debt. (*Id.* ¶¶ 357–58.) As a result of this financial distress, Tribune and many of its subsidiaries filed for Chapter 11 bankruptcy on December 8, 2008. (*Id.* ¶ 359.)

## B. Procedural History

In 2010, the Official Committee of Unsecured Creditors of Tribune (the "Unsecured Creditors") sought standing in the Bankruptcy Court to assert claims on behalf of Tribune's bankruptcy estate and subsequently filed claims against Tribune's directors, officers, shareholders, and financial advisors to claw back funds transferred during the LBO. (*See In re Tribune Co.*, No. 08-bk-13141 (Bankr. D. Del.) ("Bankr. Doc."), Doc. Nos. 5668, 6150.) In connection with these proceedings, the Unsecured Creditors undertook wide-ranging discovery from over 30 persons and entities involved in the LBO, "obtained and reviewed nearly 4.5 million pages of documents" pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, and deposed "a number of" critical participants. (Bankr. Doc. 8173 at 13, 19.)

Separately, Tribune's creditors filed numerous civil actions across the country against a variety of individuals and entities associated with Tribune. On December 19, 2011, in light of these voluminous filings and pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated approximately seventy-four federal and state cases filed across the country involving more than 5,000 defendants in the Southern District of New York before Judge Holwell. *See In re Tribune Co. Fraudulent Conveyance Litig.*, 831 F. Supp. 2d 1371 (J.P.M.L. 2011). On February 9, 2012, the consolidated action was reassigned to Judge Pauley. (Doc. No. 499.) On July 23, 2012, the bankruptcy court confirmed a plan for Tribune's reorganization and transferred the Unsecured Creditors' claims to the Trustee. (Bankr. Doc. No. 12074; *FitzSimons* Compl. ¶ 26.) On March 27, 2013, the MDL and all related motions were transferred to my docket. (Doc. No. 2419.)

On September 23, 2013, this Court granted Defendants' motion to dismiss the individual creditors' state-law fraudulent conveyance claims (the "Phase One Motions"), finding that Section 362(a)(1) of the Bankruptcy Code deprives individual creditors of standing to challenge the same transactions that the Trustee is simultaneously seeking to avoid. (Doc. No. 2710.) On September 30, 2013, the parties filed a joint notice of appeal (*see* Doc. No. 2730), and on March 29, 2016 – two and a half years later – the Second Circuit affirmed this Court's decision on different

grounds, holding that the individual creditors' state-law fraudulent conveyance claims were preempted by the Section 546(e) safe-harbor provision of the Bankruptcy Code – an argument that this Court had rejected in its September 23, 2013 opinion. *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98 (2d Cir. 2016). On July 22, 2016, the Second Circuit denied rehearing *en banc*, and the Second Circuit's mandate issued on August 1, 2016. (*See* Doc. Nos. 6895, 6896.)

On September 9, 2016, the individual creditors filed a petition for a writ of certiorari with the United States Supreme Court. *See Deutsche Bank Tr. Co. Ams., et al. v. Robert R. McCormick Found., et al.*, No. 16-317. Around the same time, the Supreme Court granted certiorari in *Merit Management Group, LP v. FTI Consulting, Inc.* – a Seventh Circuit case that had rejected the Second Circuit's interpretation of Section 546(e) and held that "the section 546(e) safe harbor [does not] protect[] transfers that are simply conducted *through* financial institutions (or the other entities named in section 546(e)), where the entity is neither the debtor nor the transferee but only the conduit." 830 F.3d 690, 691 (7th Cir. 2016) (emphasis in the original). On February 27, 2018, the Supreme Court unanimously affirmed the Seventh Circuit's decision in *Merit Management*. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018). Subsequently, on April 3, 2018, Justice Kennedy and Justice Thomas issued a "statement" concerning the petition for certiorari in *Deutsche Bank*, advising the

7

parties that "consideration of the petition for certiorari [would] be deferred for an additional period of time . . . [to] allow the Court of Appeals or the District Court to consider whether to recall the mandate, entertain a Federal Rule of Civil Procedure 60(b) motion to vacate the earlier judgment, or provide any other available relief in light of [the Supreme Court's] decision in *Merit Management* . . . given the possibility that there might not be a quorum in the [Supreme] Court[,]" presumably due to conflicts posed by the sheer number of defendants in the MDL. *Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found.*, 138 S. Ct. 1162 (2018). Therefore, on May 15, 2018, the Second Circuit recalled the mandate in *Deutsche Bank* "in anticipation of further panel review." (*See* Doc. Nos. 7432, 33.)

Meanwhile, following the Court's September 23, 2013 Opinion and Order, the Court issued an order establishing the timing and procedures for Defendants' contemplated motions to dismiss many of the remaining causes of action in the MDL (the "Phase Two Motions"). (Doc. No. 5697.) Defendants then filed twelve separate motions to dismiss, including the five present motions, in the summer of 2014. The Court thereafter imposed a stay of discovery pending resolution of the Phase Two Motions.

Ultimately, the Court deferred ruling on the Phase Two Motions until after the Second Circuit issued its March 29, 2016 opinion. On January 6, 2017, the Court granted the shareholder defendants' motion to dismiss Count 1 of the *FitzSimons* complaint, which sought to avoid billions of dollars paid to Tribune's shareholders as actual fraudulent conveyances under the Bankruptcy Code. (Doc. No. 6924.) In that opinion, the Court declined to impute the intent of Tribune's officers to the corporation for purposes of the Trustee's fraudulent conveyance claim. (*Id.*) The Court also determined that, although the Independent Directors' intent could be imputed to the corporation, the Trustee had not sufficiently alleged that the Independent Directors acted with fraudulent intent. (*Id.*) As a result of that Opinion and Order, the Court terminated thousands of individual shareholders from this action.

Following the Court's January 6, 2017 Opinion and Order, the Court partially lifted the discovery stay, and, on April 5, 2017, entered a case management plan setting a discovery schedule for the Trustee and the non-moving Defendants. (Doc. No. 6952.) The Court also directed that the moving Defendants be treated as third-party Defendants with respect to discovery. (*Id.*) However, given the uncertainty occasioned by the *Deutsche Bank* petition for certiorari, the Court once again deferred ruling on the remaining Phase Two Motions pending resolution of the petition. It was not until after the April 3, 2018 "statement" from Justices Kennedy and Thomas, and the subsequent recall of the mandate by the Second Circuit in *Deutsche Bank* on May 15, 2018, that the Court issued an order on June 18, 2018 directing the parties to file a

8

joint letter regarding the status of discovery and "indicating how they wish[ed] to proceed with respect to a potential global resolution of this multi-district litigation[.]" (Doc. No. 7552.)  Thereafter, a number of parties, including the Trustee, indicated that it would not be fruitful to resume settlement discussions until "the Court has rendered rulings on the pending motions to dismiss . . . ." (Doc. No. 7586).

## II. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . .").  To meet this standard, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *ATSI Commc'ns*, 493 F.3d at 98.  However, that tenet "is inapplicable to legal conclusions."

*Iqbal*, 556 U.S. at 678.  Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.* at 570.

In addition, to state a claim for actual fraudulent conveyance, a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), *see In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b).  While "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," *id.*, this "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations[,]" *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).  Accordingly, a complaint alleging an actual fraudulent conveyance must "allege facts that give rise to a strong inference of fraudulent intent." *Id.*; *accord In re Sharp*, 403 F.3d at 56.  "An inference is strong if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (internal quotation marks omitted); *accord In re Lyondell Chem. Co. ("Lyondell III")*, 554 B.R. 635, 652 (S.D.N.Y. 2016), *reconsideration denied*, No. 16-cv-518 (DLC), 2016 WL 5818591 (S.D.N.Y. Oct. 5, 2016).  "In

determining whether this strength-of-inference requirement is met," the Court assesses "the complaint in its entirety and take[s] into account plausible opposing inferences." *Loreley*, 797 F.3d at 177 (internal quotation marks omitted). Although "the degree of particularity required" of a bankruptcy trustee may vary depending on whether "the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts," *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987), the particularity requirement still applies in cases where, as here, the bankruptcy trustee had access to "numerous documents" and "depositions of many witnesses" when crafting the Fifth Amended Complaint, *see In re Old CarCo LLC*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010).

### III. DISCUSSION

#### A. Motion 3, Motion 4, and Motion 5

In Motion 3, Motion 4, and Motion 5, subsidiary director and officer Durham J. Monsma ("Monsma"), the Chandler Trusts and the Foundations, and the Chandler Directors move, respectively, to dismiss the counts alleged against them in the *FitzSimons* Complaint. Specifically, these Defendants argue that (1) they did not breach their fiduciary duties to Tribune or its subsidiaries[5]; (2) they did not aid and abet

Tribune's officers and directors in breaching their fiduciary duties; and (3) they were not unjustly enriched by the LBO. Finally, the Chandler Directors also assert that (4) they did not violate Sections 160 or 173 of the Delaware General Corporation Law ("DGCL") in connection with the LBO. The Court address each argument in turn.

#### 1. Breach of Fiduciary Duty

#### a. The Impact of Insolvency on Corporate Directors' Fiduciary Duties

As a general matter, Delaware corporate directors owe fiduciary duties to their corporation. *See, e.g.*, *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). When the corporation is solvent, "those duties may be enforced by its shareholders, who have standing to bring derivative actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value." *Id.* (emphasis omitted). Indeed, "[i]t is well established that the directors owe their fiduciary obligations to the corporation and its shareholders." *Id.* at 99. On the other hand, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms." *Id.* (internal quotation

---

[5] In Count 14 of the *FitzSimons* Complaint, the Trustee alleges that the Chandler Trusts and the Foundations owed fiduciary duties to Tribune because they functioned as "controlling shareholders with respect to the [LBO]." (*FitzSimons* Compl.

¶¶ 491, 492.) However, in Motion 4, the Chandler Trusts and the Foundations vigorously deny that they owed any fiduciary duties to Tribune. (Motion 4 at 8–19.) Because the Court dismisses the Trustee's breach of fiduciary claims against the Chandler Trusts and the Foundations on other grounds, the Court assumes, without deciding, that the Chandler Trusts and the Foundations owed fiduciary duties to Tribune.

marks omitted).   However, when a corporation becomes insolvent, "its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." *Id.* at 101.   Accordingly, "the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *Id.* (emphasis in the original).[6]

Under Delaware law, a creditor's standing to maintain a derivative action against a corporation's directors arises at the precise moment that the corporation passes from solvency to insolvency. *Id.*; *see also* Robert J. Stearn, Jr. & Cory D. Kandestin, *Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of Solvency Tests Under the Bankruptcy Code and Delaware Law*, 36 Del. J. Corp. L. 165, 171 (2011) ("[U]pon a corporation's insolvency, its creditors gain standing to bring derivative actions for breach of fiduciary duty, something they may not do if the corporation is solvent, even if it is in the zone of insolvency."). Indeed, the Delaware Supreme Court explicitly rejected the theory that a corporation operating in the "zone of insolvency" owes some level of fiduciary duty to its creditors. *Gheewalla*, 930 A.2d at 101.   Accordingly, "[w]hen a solvent corporation is navigating in the zone of

insolvency, the focus for Delaware directors does not change:  directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners." *Id.*

Notwithstanding the Delaware Supreme Court's rejection of the "zone of insolvency" theory, Delaware courts are split regarding whether creditors – once they gain standing to sue – can assert derivative claims against a corporation based on conduct that pre-dates the corporation's insolvency. *Compare Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 180 (Del. Ch. 2014) (concluding that creditors of an insolvent corporation have standing to assert claims for any breaches of fiduciary duty that "cause[d], hasten[ed], or otherwise contribute[d] to insolvency [which] occurred before the point of insolvency in fact.") *with Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 202 (Del. Ch. 2006) (Strine, V.C.) (concluding that the litigation trust could not sue corporate directors for breaches of fiduciary duties when "the complaint fail[ed] to plead facts supporting a rational inference that [the corporation] was insolvent before any of the challenged transactions or that any of the challenged transactions would, when consummated, leave [the corporation] unable to satisfy its creditors."), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

---

[6] The Delaware Supreme Court has held that, even once a corporation becomes insolvent, creditors cannot assert *direct* claims against the corporation's directors for breaches of fiduciary duty. *Gheewalla*, 930 A.2d at 103.

Here, in light of *Gheewalla*'s rejection of the "zone of insolvency" theory, the Court concludes that creditors are limited under Delaware law to asserting breach of fiduciary duty claims for conduct that either (1) occurred while the corporation was insolvent, or (2) directly and definitively caused the corporation to become insolvent. Creditors cannot sue for actions that simply made a solvent corporation "less valuable as an entity," even if that corporation eventually became insolvent. *Trenwick*, 906 A.2d at 201; *see also In re Tropicana Entm't, LLC*, 520 B.R. 455, 471 (Bankr. D. Del. 2014) (holding that a creditor "must allege either that a corporation was insolvent or became insolvent as a result of the misconduct" in order to bring a derivative suit for breaches of fiduciary duty). The Court agrees that "[a]ny lesser standard would undercut the utility of the business judgment rule by permitting creditors to second-guess good faith action simply because the [corporation] ultimately became insolvent[,]" *Trenwick*, 906 A.2d at 203, and would conflict with *Gheewalla*'s mandate that corporate directors "must continue to discharge their fiduciary duties . . . for the benefit of its shareholder owners" even while the corporation is in the zone of insolvency, *Gheewalla*, 930 A.2d at 101.

### b. Insolvency Tests

Thus, in order to determine whether the Trustee – who represents the interests of Tribune's creditors in this action – has standing to assert fiduciary duty claims against Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors, the Court must determine *when* Tribune actually became insolvent.

"Delaware courts define insolvency in two ways. . . . 'First, a company is insolvent if it is unable to pay its debts as they fall due in the usual course of business. Second, a company may be insolvent if it has liabilities in excess of a reasonable market value of assets held.'" *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (quoting *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, LLC*, 864 A.2d 930, 947–48 (Del. Ch. 2004), *vacated on other grounds*, 875 A.2d 632 (Del. 2005)); *see also N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *10 (Del. Ch. Sept. 1, 2006) ("Insolvency may be demonstrated by either showing (1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business.") (internal quotations omitted), *aff'd*, 930 A.2d 92.

In his opposition brief, the Trustee contends that Tribune was insolvent under both of these tests – the "inability to pay debts when due" test and the "balance sheet" test. (Opp'n at 33–37.) However, the Trustee also asks the Court to apply a third test – the "unreasonably small capital" test – which posits that a company is insolvent when "it is left with unreasonably small capital for the ongoing function of its business[.]" (Opp'n at 33.) The Trustee

cites three cases in support of this argument. (*Id.* at 34.) However, two of those cases applied the "unreasonably small capital" test pursuant to different states' laws. *See In re Tronox Inc.*, 503 B.R. 239, 320 (Bankr. S.D.N.Y. 2013) (applying Oklahoma law); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1063 (3d Cir. 1992) (applying Pennsylvania law). And the third – *In re Suburban Motor Freight, Inc.*, 124 B.R. 984 (Bankr. S.D. Ohio 1990) – involved a claim under Section 548 of the Bankruptcy Code, which explicitly lists insolvency and the unreasonably small capital test as alternative predicates for bringing a constructive fraudulent conveyance claim. *See* 11 U.S.C. 548(a)(1)(B)(ii). Accordingly, the Court sees no basis for applying the unreasonably small capital test in assessing the Trustee's Delaware law fiduciary duty claims, and declines to do so. Indeed, applying the unreasonably small capital test would be totally inconsistent with Delaware's rejection of the "zone of insolvency" theory discussed above. *See Gheewalla*, 930 A.2d at 101.

The Trustee also urges the Court to consider Step One and Step Two of the LBO as a unitary transaction; that is, to include, "in assessing Tribune's solvency at the time of Step One, the debt Tribune had already agreed it would incur just a few months later to consummate Step Two[.]" (Opp'n at 33 n.13.) According to the Trustee, if the Court finds that the LBO rendered Tribune insolvent, then it should conclude that Tribune was insolvent as of April 1, 2007 –

the day that Tribune's Board originally voted to approve the LBO.

In support of this theory, the Trustee relies on *Orr v. Kinderhill Corp.*, in which the Second Circuit considered the transfer of property from a corporation to its subsidiary and the subsequent distribution of the corporation's shares in that subsidiary to its own shareholders to be a "single, integrated transaction" under the New York Uniform Fraudulent Conveyance Act. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993). As the Second Circuit subsequently explained in a different case, "[i]t is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [New York Uniform Fraudulent Conveyance Act]." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (citing *Orr*, 991 F.2d at 35–36). But the fact that a multilateral transaction can be treated as a single transaction under the New York Uniform Fraudulent Conveyance Act has little bearing on whether a court may conduct a similar analysis under Delaware law.

Moreover, even assuming that Delaware law does allow a court to collapse a multilateral transaction into a single transaction for purposes of assessing a corporation's solvency, it would be inappropriate to do so in this case. While the Second Circuit's "collapsing" methodology "finds its most frequent application to lenders who have financed

leveraged buyouts of companies that subsequently become insolvent[,]" the "paradigmatic" case for applying this approach – collapsing two transfers where "one transferee gives fair value to the debtor in exchange for the debtor's property [*i.e.*, transfer one], and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee [*i.e.*, transfer two]" – bears little resemblance to the complex, two-step LBO transaction at issue here. *Frank*, 48 F.3d at 635; *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) (treating "two exchanges" as "part of one integrated transaction" where "[t]he $4,085,000 in . . . loan proceeds which were lent immediately by the borrowing companies to [the holding company] were merely passed through the borrowers to [the holding company] and ultimately to the selling stockholders . . . ."); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 998 (S.D.N.Y. 1991) (collapsing transactions in light of the fact that the monetary transfers "were merely passed through the corporation to the shareholders.").

In *In re Sabine Oil & Gas Corp.*, Judge Chapman identified three factors to be considered in determining whether to apply the "collapsing doctrine" to a multilateral transaction: "[1] [w]hether all of the parties involved had knowledge of the multiple transactions; [2] [w]hether each transaction would have occurred on its own; and [3] [w]hether each transaction was dependent or conditioned on other transactions." 547 B.R. 503, 541 (Bankr. S.D.N.Y.) (citing *In*

*re Adelphia Commc'ns Corp.*, 512 B.R. 447, 491 (Bankr. S.D.N.Y. 2014)), *aff'd* 562 B.R. 211 (S.D.N.Y. 2016).

Here, the relevant parties clearly knew about both steps of the LBO, and, in fact, anticipated that both steps would be consummated. However, the *FitzSimons* Complaint makes clear that, even after the Board voted in favor of the LBO, and even after Step One closed, it was never *certain* that Step Two would occur. (*See, e.g.*, *FitzSimons Compl.* ¶¶ 242 ("[A]t the time of Step One, Step Two was, at a minimum, highly likely to occur."); 302 (describing three scenarios pursuant to which Step Two would not close).) In fact, the parties specifically designed the two-step framework in light of the Foundations' and the Chandler Trusts' concerns that "the deal would not actually close" "given the need to obtain approval from the Federal Communications Commission . . . ." (*Id.* ¶ 149.)

Moreover, the *FitzSimons* Complaint contains several allegations that bely the Trustee's assertion that the LBO was one, unitary transaction. For example, the Trustee alleges that Zell – who joined Tribune's Board on May 9, 2007 (over a month after the Board voted to approve the LBO on April 1, 2007) – breached his fiduciary duties to Tribune in failing to prevent the LBO from closing. *See In re Walt Disney Co.*, 2004 WL 2050138, at *4 (Del. Ch. Sept. 10, 2004) ("[O]fficers and directors become fiduciaries only when they are officially installed, and receive the

14

formal investiture of authority that accompanies such office or directorship[.]"). Similarly, the Trustee blames Tribune's directors for "failing to act" in December of 2007 when they, too, could have prevented Step Two from closing. (*FitzSimons* Compl. ¶ 327.) These allegations demonstrate the Trustee's tacit acknowledgement that the LBO was not a unitary transaction that occurred, or became inevitable, on April 1, 2007.

Accordingly, the Court concludes that Step One and Step Two of the LBO were independent transactions. *Cf. Sabine Oil & Gas Corp.*, 547 B.R. at 542 (applying the "collapsing doctrine" in light of the fact that the second transaction "could [not] have been stopped or have been reversed" after the first transaction occurred). The Court therefore analyzes the Trustee's insolvency allegations at each step of the LBO.

c. Allegations of Tribune's Insolvency

Although the Trustee conclusorily alleges that "[c]onsummation of Step One rendered the Company balance sheet insolvent, unable to pay its debts as they came due, and inadequately capitalized" (*FitzSimons* Compl. ¶ 288), the law is clear that "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do[,]" *Iqbal*, 556 U.S. at 678 (internal quotations omitted). Here, the Trustee fails to allege any facts suggesting that Tribune was insolvent at Step One of the LBO under either the "balance sheet" or the "inability to pay debts when due" tests.

With respect to balance sheet insolvency, the Trustee's assertions mostly relate to Step Two of the LBO. Nevertheless, the Trustee does allege that (1) "[p]rior to Step One, Tribune's year to date performance was already tracking the downside case 'B' included in the February Projections"; (2) "[i]n advance of the Step One close, S&P reduced the rating on Tribune's notes to CCC+"; and (3) solvency firm "Houlihan [Lokey] determined it would be tough to opine Tribune was solvent at Step One, and later stated that Tribune was insolvent at the time of Step One and was more insolvent at the time of Step Two". (Opp'n at 35 (citing *FitzSimons* Compl. ¶¶ 268, 245, 197).) However, these allegations fail to support a finding that Tribune's liabilities exceeded its assets as of the close of Step One. Indeed, the fact that Tribune's financial situation was trending in the wrong direction prior to Step One, and that Standard & Poor downgraded Tribune's debt in advance of Step One, is totally irrelevant to the balance sheet test. And while the *FitzSimons* Complaint does allege that Houlihan "commented" in December 2007 that "the Company was insolvent in May and is more so now" (*FitzSimons* Compl. ¶ 197), the Trustee never affirmatively alleges that this was true, nor does he bother to explain the basis for Houlihan's "comment." Moreover, as demonstrated by the discussion of insolvency above, the term "insolvent" carries more than one meaning – both legally and colloquially – and Houlihan never suggested that Tribune, at Step One of the LBO, was insolvent pursuant to

Delaware's balance sheet test. Thus, the Court concludes that the Trustee has inadequately pleaded that Tribune was balance sheet insolvent at Step One.

As for the "inability to pay debts when due" test, the Trustee's insolvency argument hinges upon his assertion that the Court "ha[s] to consider[]" Tribune's Step Two debt at Step One because the "inability to pay debts when due" test is "forward looking and explicitly require[s] consideration of contemplated future transactions." (Opp'n at 34 n.14.) The Trustee alleges, for example, that "[s]hortly after Step One closed, Lehman reported that after Step Two Tribune would be unable to cover its estimated annual interest expense from operations, let alone have free cash to pay down debt each year." (Opp'n at 37 (citing FitzSimons Compl. ¶ 294).) However, the Trustee mischaracterizes Delaware's "inability to pay debts when due" test. In Pereira, the Second Circuit explicitly rejected an insolvency test similar to the Trustee's proposed version of the "inability to pay debts when due" test as inapplicable under Delaware law, noting that such a test "projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at *whether the corporation has been paying bills on a timely basis* and/or whether its liabilities exceed its assets." 413 F.3d at 343 (emphasis added). Because the Trustee never alleges that Tribune failed to pay any of its debts in a timely manner – prior to Step One *or* Step Two – his claim that Tribune was insolvent pursuant to the

"inability to pay debts when due" test must fail.

Nevertheless, the Court concludes that the Trustee has adequately pleaded that Tribune was rendered insolvent by, and at, Step Two of the LBO. Specifically, the Trustee alleges that Tribune took on $13.7 billion in debt over the course of the LBO (*FitzSimons* Compl. ¶ 354) even though Tribune, "at the time the second step of the LBO closed in December 2007, was worth no more than $10.4 billion" (*id.* ¶ 20). This allegation is sufficient to support a "balance sheet" theory that Tribune's liabilities outweighed its assets at Step Two.

Unfortunately for the Trustee, however, his allegations of insolvency at Step Two are totally irrelevant to his fiduciary duty claims against the Chandler Directors and the Chandler Trusts. That is because the Chandler Directors resigned from Tribune's board at the close of Step One, and the Chandlers Trusts no longer owned any Tribune stock at the time of the Step Two transaction. (*FitzSimons* Compl. ¶¶ 35–37, 491.) Thus, the Chandler Directors' and the Chandler Trusts' fiduciary duties to Tribune terminated prior to Tribune's insolvency. Accordingly, as explained above, the Trustee does not have standing to assert fiduciary duty claims against either the Chandler Directors or the Chandler Trusts.

With respect to Monsma, the Trustee likewise fails to allege that Tribune's subsidiaries were insolvent as of Step One of the LBO. (*See FitzSimons* Compl. ¶ 472 (alleging that "the Subsidiary Guarantors

were rendered insolvent by the LBO").) And the Trustee admits that Monsma "was not a director or officer of a Subsidiary Guarantor during Step Two of the LBO." (Opp'n at 65; *see also FitzSimons* Complaint, Ex. B.) Consequently, the Trustee does not have standing to assert a breach of fiduciary duty claim against Monsma either.[7]

The Foundations are situated somewhat differently, as they still owned 10% of Tribune's stock at Step Two. (*Id.* ¶ 492.) But the Trustee's theory that the Foundations owed fiduciary duties to Tribune is premised on the argument that the Foundations functioned as "controlling shareholders with respect to the [LBO]." (*FitzSimons* Compl. ¶ 492.) Specifically, the Trustee alleges that the Foundations "exercised their control over the company . . . [in] causing Tribune to transform the LBO structure and ultimately enter into the LBO." (*Id.*) However, the Trustee fails to allege *any* activity by the Foundations

following the close of Step One, let alone activity demonstrating control over Tribune. The Trustee therefore fails to allege that the Foundations owed fiduciary duties to Tribune following the close of Step One, and his breach of fiduciary duty claims against the Foundations must be dismissed for the same reasons as his claims against the Chandler Directors, the Chandler Trusts, and Monsma.

## 2. Aiding and Abetting Liability

The Trustee also alleges that Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors aided and abetted Tribune's officers and directors in breaching their fiduciary duties to Tribune. But again, the Trustee fails to allege any action by Monsma, the Chandler Trusts, the Foundations, or the Chandler Directors after the close of Step One, and he lacks standing to assert aiding and abetting claims for breaches that occurred at, or prior to, Step One. As a result, the Trustee's aiding and abetting claims against Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors must be dismissed as well.

## 3. Unjust Enrichment

The Trustee also asserts claims for unjust enrichment against Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors. Specifically, the Trustee "seeks restitution from these defendants and an order of this Court disgorging all payments, transfers, credit, profits, fees, benefits, incentives, and other

---

[7] Moreover, any argument that Defendant Monsma breached his fiduciary duties to Southern Connecticut Newspapers, Inc. and TMLS1, Inc. – the two subsidiaries of which he was a director – would also fail on the merits, since "Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation . . . ." *Trenwick*, 906 A.2d at 201. Thus, because the Trustee has failed to allege that Southern Connecticut Newspapers, Inc. or TMLS1, Inc. were insolvent during Monsma's tenure as a director or officer of either subsidiary, Monsma was free to simply sign the Step One guarantees at Tribune's request. *See id.* ("There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes . . . .").

things of value obtained by the defendants as a result of their wrongful conduct and breaches of fiduciary duties." (*FitzSimons* Compl. ¶ 611.)

The Trustee argues that, pursuant to Delaware choice of law rules, Illinois law governs his unjust enrichment claim. (Opp'n at 125–26.) But because the same result would obtain under either Delaware or Illinois law, the Court need not resolve this choice of law issue. Indeed, although the elements of an unjust enrichment claim differ slightly under Delaware and Illinois law, both states require that the plaintiff allege either a mistake or "some type of wrongful conduct" on the part of the defendant. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 161 (1989); *see also In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 657 n.73 (Del. Ch. 2008).

Here, the Trustee does not argue that Tribune mistakenly transferred assets to any of the defendants, and the only wrongful conduct that he alleges against Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors is that they "rendered [Tribune] insolvent and harmed its creditors" "in dereliction of their fiduciary duties[.]" (Opp'n at 131; *see also FitzSimons* Compl. ¶¶ 609–11.) But the Court has already concluded that Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors did not render Tribune insolvent at Step One, and they never owed any fiduciary duties to Tribune's creditors. Therefore, the Court also

dismisses the unjust enrichment claims asserted against them.

### 4. DGCL Sections 160 and 173

Finally, the Trustee alleges that the Chandler Directors violated Sections 160 and/or 173 of the DGCL by "willful[ly] or negligent[ly] approv[ing] and/or facilitati[ng]" the transfer or "cash and/or property to [Tribune's] shareholders . . . while Tribune lacked a sufficient surplus or net profits or was otherwise insolvent[.]" (*FitzSimons* Compl. ¶ 386.) Notably, Section 174 of the DGCL provides that corporate directors are "jointly and severally liable" for "any wilful or negligent violation[s]" of Section 160 or 173 of the DGCL that occurred "under [their] administration." Del. Code Ann. tit. 8, § 174(a). DGCL Sections 160 and 173, in turn, forbid a Delaware corporation from (1) "purchas[ing] or redeem[ing] its own shares of capital stock . . . when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation[,]" and (2) paying dividends when the corporation has no "surplus."[8] *Id.* §§ 160, 173, 170.

Here, however, the Trustee admits that, under Delaware law, the test for whether a corporation "has no 'surplus'" and whether "its capital is 'impaired'" is equivalent to the

---

[8] While not relevant to this opinion, Delaware law allows corporations, under certain circumstances, to pay dividends even if they do not have a "surplus." *See* Del. Code Ann. tit. 8, § 170(a)(2).

balance sheet insolvency test. (*See* Opp'n at 82); *see also SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 982 (Del. Ch. 2010) ("As a practical matter, the [capital impairment] test operates roughly to prohibit distributions to stockholders that would render the company balance-sheet insolvent . . . ."). Once again, the Trustee's failure to allege that Tribune was insolvent at Step One proves fatal to the Trustee's claim that the Chandler Directors violated DGCL Sections 160 and/or 173.

### B. Motion 6

In Motion 6, certain Tribune executives who were involuntarily terminated within one year of the LBO (the "Motion 6 Defendants") move to dismiss the actual and constructive fraudulent conveyance claims set forth in Count 34 of the *FitzSimons* Complaint and Count 2 of the Tag-Along Complaints.[9]

Under certain circumstances, the Bankruptcy Code authorizes a bankruptcy trustee to avoid transfers of the debtor's property and "obligation[s] . . . incurred by the debtor" that were made or incurred by the debtor within two years of its filing for bankruptcy. 11 U.S.C. § 548(a)(1). Specifically, avoidance is authorized where the transfer or obligation is an actual

fraudulent conveyance – that is, one made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." *Id.* § s548(a)(1)(A). The Code also allows for the avoidance of constructive fraudulent conveyances, defined as transfers or obligations for which (1) the debtor received less than "reasonably equivalent value in exchange[,]" and (2) the debtor was, among other things, insolvent "on the date that such transfer was made or such obligation was incurred[.]" *Id.* § 548(a)(1)(B).

Here, the Trustee seeks to avoid and "claw back" severance payments made to the Motion 6 Defendants following their termination in the wake of the LBO (the "Motion 6 Transfers"). The Motion 6 Defendants respond that the obligations underlying the Motion 6 Transfers were incurred more than two years prior to Tribune's filing for bankruptcy, and are therefore not avoidable pursuant to 11 U.S.C. § 548(a)(1). They also contend that the Trustee cannot avoid the Motion 6 Transfers themselves because he has failed to allege (1) that they were made with an actual intent to hinder, delay, or defraud Tribune's creditors, or (2) that they were made for less than reasonably equivalent value. The Court will address each argument in turn.

### 1. Tribune's Obligations Under The Company's Transitional Compensation Plan

The parties agree that the Motion 6 Transfers were made pursuant to Tribune's

---

[9] The Motion 6 Defendants are: James L. Ellis, Dennis J. FitzSimons, Donald C. Grenesko, David Dean Hiller, Timothy P. Knight, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, R. Mark Mallory, Richard H. Malone, David P. Murphy, John E. Reardon, Irene M.F. Sewell, Scott C. Smith, John J. Vitanovec, and Kathleen M. Waltz.

Transitional Compensation Plan for Executive Employees, which was enacted in 1985 and last amended on July 19, 2006. (Doc. No. 5935-3 (the "Plan").) Under the Plan, participants – defined as "[a]ny full-time, key executive employee of Tribune Company or any of its subsidiaries . . . designated by the Committee as being covered by the Plan" – were eligible to "receive transitional compensation, in the amounts and at the times described in paragraph 5 [of the Plan]," if they were involuntarily terminated within 36 months after a "Change in Control," itself defined to include the "[c]onsummation of a reorganization, merger, consolidation or other transaction involving Tribune Company . . . ." (*Id.* §§ 1, 3, 4(c).) The LBO certainly constituted such a change of control, and it is undisputed that the Motion 6 Defendants were terminated within 36 months of the LBO. (*See* Opp'n at 102; *FitzSimons* Compl., Ex. C.) Thus, pursuant to the Plan, the Motion 6 Defendants were eligible to receive "transitional compensation" following their termination. Accordingly, the only question before the Court is *when* Tribune's "obligations" to make the Motion 6 Transfers were incurred.

As a threshold matter, the Motion 6 Defendants ask that the Court take judicial notice of the Plan, which is attached as Exhibit C to the Declaration of Amy Y. Cho and was included as Exhibit 10.7 to Tribune's 2007 Form 10-K filing. (Mot. 6 at 3 n.2.) In light of the fact that the Trustee does not object to this request, the Court takes judicial notice of the Plan. *See, e.g.*,

*Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include . . . public disclosure documents required by law to be, and that have been, filed with the SEC . . . .") (internal citations omitted).

The Motion 6 Defendants principally argue that the Trustee cannot avoid Tribune's obligations to make the Motion 6 Transfers because those obligations were incurred more than two years before Tribune filed for bankruptcy. (Mot. 6 at 5.) Specifically, the Motion 6 Defendants assert that the obligations were incurred no later than July 19, 2006, when the Plan was last amended – which is more than two years before Tribune filed for bankruptcy on December 8, 2008.

The Trustee, by contrast, contends that Tribune "did not become liable to make any severance payments to any of the Insider Payment Defendants until they were terminated (and the other conditions to payment under the Plan were met)." (Opp'n at 103.) That is, according to the Trustee, an "obligation" is only incurred upon the fulfillment of all conditions precedent, when payment is certain.

Given the absence of a statutory definition for the word "obligation" and the dearth of caselaw interpreting that term, the Court looks to other provisions of the Bankruptcy Code for guidance. Indeed, both the Bankruptcy Code and the Second Circuit appear to treat "debt" and

"obligation" as equivalent terms. *See, e.g.*, 11 § U.S.C. 101(14A) (defining a "domestic support obligation" to mean "a debt that accrues" in connection with domestic support); *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999) (equating a "transfer or obligation" under Section 548 with a "conveyance or incurrence of debt").

But while the Trustee cites to a number of cases standing for the proposition that a "debt" arises "when the debtor becomes legally bound to pay[,]" *In re Transpacific Carriers Corp.*, 50 B.R. 649, 652 (Bankr. S.D.N.Y. 1985), *aff'd*, 113 B.R. 139 (S.D.N.Y. 1990), "the [caselaw] reveals an obvious trend [towards] interpreting 'antecedent debt' [under Section 547] broadly and rejecting the proposition that debt is only incurred as it becomes due[,]" *In re Enron Corp.*, 357 B.R. 32, 44 (Bankr. S.D.N.Y. 2006) (compiling cases). "Though these [more recent cases] applied the 'legally obligated to pay' standard, they concluded that the legal obligation arose not . . . when the agreement was breached or payment due[,] but when . . . the agreement was made." *Id.* at 44–45.

The Court concludes that this broader definition of "debt" is more clearly supported by the statutory text. Specifically, the term "debt" is defined by the Bankruptcy Code to mean "liability on a claim." 11 U.S.C. § 101(12). A "claim," in turn, is defined to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" *Id.* § 101(5)(A) (emphasis added). Thus, even if a right to payment is unliquidated, contingent, and disputed, "such right still constitutes a claim under the Bankruptcy Code, and where a claim exists, so does a debt." *Enron*, 357 B.R. at 45 (internal quotations omitted); *see also Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990) ("Section 101(11) of the Bankruptcy Code defines 'debt' as a 'liability on a claim.' This definition reveals Congress' intent that the meanings of 'debt' and 'claim' be coextensive."). Accordingly, the Court concludes that a "debt" is incurred when a contract or agreement is formed, not when payment becomes due under that contract.

This conclusion applies with equal force to "obligations" under Section 548, and is supported by the most relevant Section 548 caselaw. For example, in *In re Incentium, LLC*, the bankruptcy court held that severance payments made pursuant to the terms of an employment contract could not be avoided because "the original Employment Agreement" was created more than two years prior to the debtor's bankruptcy filing, even though the transferee's employment was ultimately terminated within the applicable two-year window. 473 B.R. 264, 272 (E.D. Tenn. 2012). Accordingly, the Court holds that, for purposes of Section 548, an "obligation" is incurred when a contract or agreement is formed. There is no requirement that every condition precedent set forth in the contract

or agreement be fulfilled prior to the triggering of the obligation.

The Trustee next contends that, in the alternative, the Court should find that Tribune incurred the relevant obligation on April 1, 2007, "when it entered into the Merger Agreement providing that the post-LBO Tribune entity would make the Executive Transition Payments." (Opp'n at 104.) As the Trustee explains in the *FitzSimons* Complaint, "[t]he Merger Agreement expressly provided that the LBO would constitute a 'Change of Control' under all of Tribune's various employee benefits plans, and that the surviving company – not just pre-LBO Tribune – was obligated to pay the Executive Transition Payments[.]" (*FitzSimons* Compl. ¶ 160; *see also id.* ¶ 638 (alleging that Tribune "incurred *or reaffirmed* the obligation to make the Insider Payments" "[w]ithin two years before the Petition Date[.]") (emphasis added).)

However, the mere fact that Tribune "reaffirmed" its obligations pursuant to the Plan on April 1, 2007 does not alter the reality that Tribune incurred its obligation to make the Motion 6 Transfers at an earlier date. And the two cases cited by the Trustee in support of its argument – *TSIC, Inc. v. Thalheimer* and *In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010) – are wholly inapposite.

In *TSIC*, the debtor's chief executive officer entered into an employment contract with the debtor in 2002 in which the debtor

agreed to pay him a base salary of $850,000 and an unspecified "severance package upon termination of his employment[.]" *TSIC*, 428 B.R. at 107–08. *After* his employment was terminated in 2006, the parties entered into a "settlement agreement" that "provided for [the CEO] to receive $1.775 million in severance, $3.9 million in SERP benefits, $300,000 in secretarial and office allowances, and up to $800,000 in reasonable attorney's fees in negotiating the Settlement Agreement." *Id.* at 108. Under these circumstances, the court concluded that the debtor's obligation to pay the transferee his severance package was incurred in 2006 pursuant to the settlement agreement, rather than in 2002 under the original employment agreement. The court explicitly noted that "[a]lthough the Employment Agreement contemplated 'severance payments' and 'SERP benefits,' the details of these benefits were not finalized at the time the parties signed the Employment [Agreement]." *Id.* at 114.

Similarly, in *TransTexas Gas*, the debtor entered into an employment agreement with its chief executive officer in 2000 providing that "[a]t termination, [he] would be entitled to severance pay." 597 F.3d at 302. Specifically, the contract provided that "[i]f he were dismissed for reasons other than cause, he would receive three million dollars. If he were terminated for cause, his payment would be one and a half million dollars. If he voluntarily resigned, he would be paid no severance." *Id.* Two years later, following a meeting of the board of directors, the debtor and the CEO "agreed

that he would resign." *Id.* The parties then executed a "separation agreement" which provided for a three million dollar payment to the CEO. *Id.* In holding that the debtor incurred its obligation under Section 548 when the separation agreement, and not the original employment agreement, was formed, the court explained that the CEO was likely not entitled to a three million dollar severance payment under his original employment contact since he resigned and probably could have been terminated for cause. *Id.* at 307.

Here, in contrast, the Plan specifically provided that participants were eligible to "receive transitional compensation" in specific, predetermined amounts if they were involuntarily terminated within 36 months after a "Change in Control." As explained above, the Trustee admits that the Motion 6 Defendants were involuntarily terminated within 36 months of the LBO. (Opp'n at 102; *FitzSimons* Compl., Ex. C.) And while the *FitzSimons* Complaint alleges that the LBO "Merger Agreement expressly provided that the LBO would constitute a 'Change of Control' under all of Tribune's various employee benefit plans" (*FitzSimons* Compl. ¶ 160), the LBO – as a "reorganization, merger, consolidation or other transaction involving Tribune Company" in which "persons who were the shareholders of the Tribune Company immediately prior to such reorganization, merger, consolidation or other transaction [did] not, immediately thereafter, own, directly or indirectly, 50% or more of the combined voting power of the then

outstanding securities" (Plan § 4(c)) – also constituted a Change of Control pursuant to the express terms of the Plan. Thus, the LBO Merger Agreement did not in any way modify or supplement the terms of the Plan.

To be sure, the LBO merger agreement also provided that "the surviving company – *not just pre-LBO Tribune* – was obligated to pay the Executive Transition Payments." (*FitzSimons* Complaint ¶ 160 (emphasis added).) But the fact that the surviving company expressly assumed Tribune's obligations pursuant to the LBO merger agreement is irrelevant. Indeed, the merger agreement, which "simply provided that Tribune, as the surviving corporation under the merger, would fully 'honor, fulfill, and discharge' its preexisting obligations under the Plan[,] . . . simply reflected a result that would have occurred by operation of law in any event." (Mot. 6 at 5.) That is, Delaware law expressly provides that the "surviving or resulting corporation" of a merger is:

> subject to all the restrictions, disabilities and duties of each of [the constituent] corporations so merged or consolidated; and all . . . rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent

23

as if said debts, liabilities and duties
had been incurred or contracted by it.

Del. Code Ann. tit. 8, § 259.  Therefore, the
merger agreement did no more than
"reaffirm" that Tribune was legally
obligated to honor its prior contracts and
abide by the terms and conditions set forth
in the Plan.  *See In re Incentium*, 473 B.R. at
272 (holding that an obligation to make
severance payments was incurred as of the
date of the transferee's employment
agreement, and not a subsequent separation
agreement that incorporated the debtor's
obligation under the employment agreement,
since the obligation allegedly created by the
separation agreement was "the same
severance obligation created by the original
Employment Agreement and was part of the
overall compensation package negotiated to
hire the defendant as the debtor's CEO.").

As a last resort, the Trustee protests that
the Motion 6 Defendants' argument – that
Tribune "became obligated to pay them
severance from the moment it adopted [the
Plan] back in 1985 (or in 2006, when the
Plan was last amended)" – would lead to the
"patently absurd" result that Tribune
"became obligated to pay at least some of
[the Motion 6 Defendants] severance *before
they were even employed by Tribune*."
(Opp'n at 103 (emphasis in the original).)

But the Trustee's *reductio ad absurdum*
argument does not undermine the Court's
holding that, for purposes of Section 548, an
"obligation" is incurred when a contract is
formed, and not when the debtor's

obligations under the contract are triggered
by the fulfillment of any conditions
precedent set forth in that contract.  Here,
the relevant contract was "formed" as to
each of the Motion 6 Defendants on the later
of two dates: (1) the date on which each
Defendant became a participant under the
Plan, or (2) the date on which the Plan was
last substantively amended.  Put simply, the
Trustee cannot avoid Tribune's obligations
to make the Motion 6 Transfers to any
Motion 6 Defendant who was a participant
of the Plan as of December 7, 2006 – two
years and one day before Tribune filed for
bankruptcy.

Significantly, the *FitzSimons* Complaint
affirmatively alleges that two of the Motion
6 Defendants – Dennis J. FitzSimons and
Donald C. Grenesko – were "full-time, key
executive employee[s]" of Tribune as of at
least September 2006, when Tribune's
Special Committee was formed. (*See
FitzSimons* Compl. ¶¶ 136, 27, 43.)  Thus,
Tribune's obligations to Defendants
FitzSimons and Grenesko are clearly not
avoidable.  As for the remaining Motion 6
Defendants, the *FitzSimons* Complaint does
not even attempt to allege when they were
hired by Tribune or otherwise became Plan
participants.[10]  Given this absence of factual

---

[10] Indeed, the Tag-Along Complaints do not allege
*any* specific details regarding the relationship
between the Tag-Along Defendants and Tribune, let
alone when they became full-time, key executive
employees of Tribune or its subsidiaries. (*See, e.g.*,
13-cv-3737, Doc. No. 21 (alleging merely that
"Defendant Sewell was an insider as defined by
section 101(31) of the Bankruptcy Code at the time
the Transfers occurred and/or were arranged[,]" that
"[t]he Tribune Company . . . made one or more

24

allegations, the Trustee has failed to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 115 (Bankr. S.D.N.Y. 2011) ("To the extent that the Court is unable to determine whether a transfer falls under the look-back period of any applicable law, the Trustee's claim to avoid it as a Constructive Fraudulent Transfer fails under Rule 8(a) to provide 'the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Accordingly, the Trustee has failed to state a claim for avoidance of Tribune's obligations under the Plan.

### 2. The Motion 6 Transfers

Of course, the Trustee also seeks to avoid the actual Motion 6 Transfers themselves, which were indisputably made during the two-year window preceding Tribune's bankruptcy filing. The Trustee seeks to avoid these transfers as both actual and constructive fraudulent conveyances. The Court will address each theory in turn.

#### a. Actual Fraudulent Conveyance

As noted above, Section 548 of the Bankruptcy Code authorizes a bankruptcy trustee to avoid a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Here, the Trustee's allegations of actual fraudulent intent with respect to the Motion 6 Transfers mirror his allegations regarding the "shareholder transfers" that were the subject of this Court's January 6, 2017 Opinion and Order. (Doc. No. 6924; *see FitzSimons* Complaint ¶ 639 ("Tribune . . . made the Insider Payments with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs 379 and 380, which are incorporated herein by reference.").) Indeed, the Trustee argues that the Motion 6 Transfers constituted actual fraudulent conveyances because they were "made pursuant to the Merger Agreement documenting the LBO and were intrinsically tied to and made part of the LBO." (Opp'n at 108.)

However, this Court has already held that the LBO did not constitute an actual fraudulent conveyance. (*See* Doc. No. 6924 (finding that the Trustee "has . . . failed to allege that Tribune entered the LBO 'with actual intent to hinder, delay, or defraud' its creditors and fails to state a claim upon which relief may be granted . . . .").) Accordingly, for the reasons set forth in the January 6, 2017 Opinion and Order, the Court concludes that the Trustee has failed to plead that the Motion 6 Transfers were actual fraudulent conveyances.

---

payments to Defendant Sewell in the year prior to the Petition Date[,]" and that "[t]he Transferor made the Transfers to Defendant Sewell during the Preference Period in an amount not less than $387,850.00.")).

b.  Constructive Fraudulent Conveyance

Having failed in his actual fraudulent conveyance claim, the Trustee nevertheless argues that the Motion 6 Transfers can still be avoided as *constructive* fraudulent conveyances because they were not made for reasonably equivalent value.    In assessing reasonably equivalent value, a court must determine "whether the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994); *see also In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) ("Defined quantitatively, the debtor should receive a fair    equivalent    or    an    amount    not disproportionately small as compared with the value of the property or obligation the debtor has given up." (internal quotation marks omitted)), *aff'd sub nom.*, *Balaber-Strauss    v.    Lawrence*,    264    B.R.    303 (S.D.N.Y. 2001).

Here, the Trustee claims that severance payments are made for less than reasonably equivalent value "as a matter of law" because "[s]everance, by definition, is paid only to former employees who no longer provide value of any kind to the transferring employer and who received regular salaries or other compensation for their work while they were employed."    (Opp'n at 105.) Once again, the Trustee is seriously mistaken, and the two cases cited in support of his erroneous claim do not stand for such a proposition. *See TSIC*, 428 B.R. at 115 (finding    that    the    debtor's    transfer    of

"severance payment[s] was for less than reasonably equivalent value" after avoiding the underlying obligation, which had been incurred *after* the transferee's termination); *TransTexas Gas*, 597 F.3d at 307 (same).

Contrary to the Trustee's unsupported assertion, severance payments are often included in corporate employment packages to entice well-qualified applicants to come work for an employer, and can therefore be made for reasonably equivalent value under certain circumstances.    *See, e.g., In re Incentium*, 473 B.R. at 272 (noting that a severance package was "part of the overall compensation package negotiated to hire the defendant as the debtor's CEO[,]" and explaining that "[i]t is certainly not unusual for an employment contract designed to attract a high level executive to contain a severance obligation in the event that the executive is terminated without cause.")    In fact, the Plan at issue here notes that it was adopted by Tribune's board of directors for that very reason – "to attract and retain executives of outstanding competence . . . ." (Plan at 1.)

Even more fundamentally, the Trustee's argument fails because transfers made in satisfaction of unavoidable obligations are *per se* made for reasonably equivalent value. *See, e.g., In re Incentium*, 473 B.R. at 272 ("The transfers of severance pay to the defendant satisfied the prior, unavoidable severance obligation, so the debtor received 'value' in exchange for the transfers . . . [that was] 'reasonably equivalent' to the value of the severance obligation . . . ."); *In*

*re Trinsum Grp., Inc.*, 460 B.R. 379, 388 (Bankr. S.D.N.Y. 2011) (holding that transfers made in satisfaction on an underlying obligation are "presumed" to be made "for value"). Indeed, the Bankruptcy Code "expressly includes 'satisfaction . . . of a present or antecedent debt of the debtor' in its definition of 'value.'" *In re Wilkinson*, 196 F. App'x 337, 343 (6th Cir. 2006) (quoting 11 U.S.C. § 548(d)(2)(A)). Accordingly, the Court concludes that the Motion 6 Transfers were made for reasonably equivalent value.

Finally, the Trustee argues that "an employee who breaches the duty of loyalty owed to his or her employer has no right to severance or any other compensation benefits." (Opp'n at 105.) Therefore, the Trustee asks that the Court avoid at least those transfers made to Motion 6 Defendants against whom the Trustee asserts a claim for breach of the duty of loyalty.

But while it may be true as a matter of fiduciary duty law that a corporation can recover compensation paid to an officer or director who breached her duty of loyalty, *see, e.g., Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607, 611 (Del. Ch. 1977), *aff'd,* 407 A.2d 1040 (Del. 1979), the Court's conclusion that Tribune received reasonably equivalent value for the Motion 6 Transfers rests solely on the fact that the transfers were made in satisfaction of Tribune's unavoidable obligation, pursuant to the Plan, to make those transfers. Indeed, there is nothing in the Plan indicating that it is voidable upon a breach of the duty of

loyalty, and the Trustee cites no caselaw or authority suggesting that a breach of fiduciary duty can be used under the Bankruptcy Code to avoid an otherwise unavoidable payment. Thus, while the Trustee may certainly recover some or all of the monies paid to the Motion 6 Defendants as *damages* arising out of his breach of fiduciary duty claims, he may not avoid the Motion 6 Transfers pursuant to Section 548 of the Bankruptcy Code.[11]

## C. Motion 7

The Bankruptcy Code also authorizes a bankruptcy trustee to avoid "preference" payments, which are defined as transfers of property made by an insolvent debtor to a creditor "for or on account of an antecedent debt owed by the debtor" that put the creditor in a better position than he or she would otherwise be in post-bankruptcy. 11 U.S.C. § 547(b). Under most circumstances, a trustee can only avoid preference payments made "on or within 90 days before" the debtor filed for bankruptcy. *Id.* § 547(b)(4). However, if the creditor was an "insider" "at the time of such transfer[,]" the trustee may claw back payments made

---

[11] To the extent that the arguments set forth in Motion 6 apply to other, similarly situated defendants who did not join the motion, such as Vincent A. Malcolm and Marc S. Schacher, the Court also dismisses the claims set forth in Count 34 of the *FitzSimons* Complaint and Count 2 of the Tag-Along Complaints against them. *See, e.g., Wachtler v. Cty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) ("The district court has the power to dismiss a complaint sua sponte for failure to state a claim . . . so long as the plaintiff is given notice and an opportunity to be heard.") (internal quotations marks and citations omitted).

within a year of the bankruptcy petition. *Id.* As relevant here, the Bankruptcy Code defines a corporate insider to include a director or officer of the corporation. 11 U.S.C § 101(31)(B).[12]

In Count 35 of the *FitzSimons* Complaint and Count 1 of the Tag-Along Complaints, the Trustee seeks to avoid payments made to certain employees within one year of Tribune's bankruptcy filing (the "Motion 7 Transfers"). In Motion 7, the majority of those employees (the "Motion 7 Defendants") seek dismissal of those claims.[13] Specifically, the Motion 7 Defendants argue that the Trustee has failed to allege that they were insiders *at the time the relevant transfers were made*, and that, accordingly, he cannot avoid transfers made more than ninety days before Tribune filed for bankruptcy. For the reasons that follow, the Court agrees.

1. The Insider Requirement

As explained above, Section 547 allows a bankruptcy trustee to avoid preference payments made up to a year prior to the filing of a bankruptcy petition if the creditor receiving those payments was an insider "at the time of such transfer[.]" 11 U.S.C. § 547(b)(4).

Despite the apparent clarity of this temporal language, the parties dispute what it means to be an insider at the time of a transfer. Specifically, the Trustee contends that "a claim for preference may be stated if the transferee was an insider when the payment was *arranged*, and the transfer was made within the one year look-back period applicable to preference claims against insiders." (Opp'n at 109 (emphasis added).) According to the Trustee, then, "the time of such transfer" can include both the date on which the transfer was "arranged" and the date on which the transfer actually occurred. Unfortunately for the Trustee, this theory runs contrary to both the statutory text and relevant precedent.

In *Barnhill v. Johnson*, the Supreme Court held that a transfer of an "ordinary check" does not occur for purposes of Section 547(b)(4) until the bank honors the check. 503 U.S. 393 (1992). In so holding, the Court explicitly rejected the petitioner's theory that the transfer occurred on "the date he received the check." *Id.* at 395. Indeed, the Supreme Court repeatedly emphasized that the transfer did not take effect "until the moment of honor." *Id.* at 401; *see also id.* at

---

[12] Courts "regularly" treat the examples of "insiders" set forth in Section 101(31) of the Bankruptcy Code as "illustrative of types of insider relationships and not as an exhaustive list." *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 509 (7th Cir. 2011).

[13] The Motion 7 Defendants are: Betty Ellen Berlamino, Tom E. Ehlmann, James L. Ellis, Dennis J. FitzSimons, Vincent R. Giannini, Donald C. Grenesko, John R. Hendricks, David Dean Hiller, Peter A. Knapp, Timothy P. Knight, Timothy J. Landon, Thomas D. Leach, Luis E. Lewin, Brian F. Litman, R. Mark Mallory, Richard H. Malone, Gina M. Mazzaferri, David P. Murphy, Pamela S. Pearson, John F. Poelking, John E. Reardon, Irene M.F. Sewell, Patrick Shanahan, Scott C. Smith, Kathleen M. Waltz, and Gary Weitman.

400 ("For the purposes of payment by ordinary check, therefore, a 'transfer' as defined by § 101(54) occurs on the date of honor, and not before.") Thus, the Supreme Court made clear that a transfer occurs at the precise point in time when "the [creditor] no longer ha[s] a claim against the debtor." *Id.* at 399–400.

Here, the Motion 7 Defendants still had a claim against Tribune when the Motion 7 Transfers were "arranged."  In fact, the Motion 7 Defendants had a claim against Tribune up until the exact moment when they actually received the transfers. Accordingly, because the transfers occurred at the precise moment that the Motion 7 Defendants received payment, Section 547 requires that the Motion 7 Defendants be insiders at that moment.

Section 547(e)(2), which defines a transfer "for the purposes of [Section 547 of the Bankruptcy Code,]" bolsters this conclusion.  Pursuant to Section 547(e)(2), "a transfer is made at the time such transfer takes effect between the transferor and the transferee . . . ."  This definition is inconsistent with the Trustee's suggestion that an individual can be an insider "at the time of [a] transfer" if he was an insider when the transfer was arranged – that is, before the transfer "[took] effect between the transferor and the transferee."

The Trustee nevertheless cites four cases for the proposition that "[a] creditor who is an insider at the time the transfer of the debtor's property is arranged is an insider at

the time of the transfer." *In re F & S Cent. Mfg. Corp.*, 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985); *see also In re Vaniman Int'l, Inc.*, 22 B.R. 166, 189 (Bankr. E.D.N.Y. 1982) ("That [the transferees] ceased to be [insiders] simultaneously with the transfers is of no significance."); *In re EECO Inc.*, 138 B.R. 260, 264–65 (Bankr. C.D. Cal. 1992) (explaining that "the transfer occurred when it was arranged"); *In re Consol. Indus. Corp.*, 292 B.R. 354, 363 (N.D. Ind. 2002), *rev'd and remanded sub nom. Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008).

The Court is not persuaded by the reasoning in any of those cases – three of which were decided before *Barnhill*.  In fact, *In re EECO Inc.* – which explicitly relied upon the Ninth Circuit's pre-*Barnhill* holding that "[a] debtor's payment by check on an existing debt, presented to the bank within a reasonable time and honored by the bank, is deemed made at the time the debtor gave the check to the creditor" – can be rejected out of hand.   138 B.R. at 264 (quoting *In re Kenitra, Inc.*, 797 F.2d 790, 791 (9th Cir. 1986)).   And the other decisions cited by the Trustee did not even look to the statutory text in reaching their conclusions.  For example, the court in *In re F & S Cent. Mfg. Corp.* – again, decided before *Barnhill* – simply concluded that "Section 547(b)(4) was not intended to allow those who are insiders to escape the insider provision by delaying . . . the date the debtor transfers its property." 53 B.R. at 849.  But while the bankruptcy court in *In re F & S Cent. Mfg. Corp.* was free to

speculate as to the intent of Congress, it was certainly not free to rewrite a statute that was clear on its face. And, again, Section 547(b)(4)(B) expressly provides that a trustee may avoid preference payments made "between ninety days and one year before the date of the filing of the petition" only if the creditor receiving those payments was an insider "at the time of such transfer."

Moreover, with only one exception, every court to have considered the issue since *Barnhill* has concluded that the transferee must be an insider on the exact date when the transfer was effected in order for Section 547(b)(4)(B) to apply. *See, e.g.*, *In re Incentium, LLC*, 473 B.R. 264, 273 (Bankr. E.D. Tenn. 2012) ("[T]he court holds that the transferee must constitute an insider at the time the transfer was made, and that it is not enough that the transferee be an insider at the time the transfer was arranged. This holding is consistent with virtually all of the cases that have examined the issue in the last twenty years."); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 344 (S.D.N.Y. 2013) ("[T]he language of section 547(b)(4)(B) states that an insider relationship is to be determined on the exact date of the challenged transfer." (quoting Collier on Bankruptcy ¶ 547.03[6] n.113)); *Stanley v. U.S. Bank, Nat. Ass'n*, 2008 WL 8866400, at *4 (S.D. Tex. Sept. 23, 2008), *aff'd sub nom. In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010) (holding that the "Bankruptcy Court erred in adopting the 'arranged-transfer' approach" in light of *Barnhill*.); *Butler v. David Shaw, Inc.*, 72

F.3d 437, 441–42 (4th Cir. 1996) (rejecting the trustee's argument that "a transfer is not a single occurrence, but rather a related sequence of events[,]" and explaining that the Supreme Court in *Barnhill* "clearly held that a transfer . . . is a single event occurring at a definite moment in time[.]").[14]

In light of this authority, the Court agrees that, in order to state a claim for avoidance of a preference payment under Section 547(b)(4)(B) that was made more than ninety days prior to a bankruptcy filing, a bankruptcy trustee must allege that the transferees were insiders at the exact moment when the transfers were effected.

## 2. Failure to State a Claim

Here, the Trustee has failed to allege that the Motion 7 Defendants were insiders on the exact date that the Motion 7 Transfers were made. In Count 35 of the *FitzSimons* Complaint, the Trustee alleges that the Motion 7 Defendants were insiders "at the time of the [LBO]."[15] (*FitzSimons* Compl. ¶

---

[14] The one court to uphold the "arranged-transfer" approach post-*Barnhill* made no mention of *Barnhill* while relying on the now discredited opinions in *In re F & S Central Mfg. Corp.* and *In re EECO Inc. See In re Consol. Indus. Corp.*, 292 B.R. at 363.

[15] Paragraph 643 of the *FitzSimons* Complaint reads: "The D&O Defendants, the Subsidiary D&O Defendants, and the Additional Officer Recipients were insiders as defined by Section 101(31) of the Bankruptcy Code at the time of the transaction." (*FitzSimons* Compl. ¶ 643.) The term "transaction," while not expressly defined, clearly refers to the LBO throughout the *FitzSimons Complaint*. (*See, e.g., id.* ¶¶ 1, 18, 119, 167, 177, 180, 181, 182, 183, 197, 211 (using the term "transaction" to refer to the LBO).)

643; *see also id.* ¶¶ 27, 43, 50–52, 58–61, 64, 65, 67 (explaining how each of the Motion 7 Defendants named in the *FitzSimons* Complaint were related to Tribune "at the time of the LBO.").) However, the Trustee fails to allege that any of the these Defendants remained Tribune insiders at the time the Motion 7 Transfers were actually made. Thus, the Court concludes that the Trustee has failed to state a claim for avoidance of the Motion 7 Transfers in the *FitzSimons* Complaint.[16]

For the same reasons, Count 1 of the Tag-Along Complaints must also be dismissed. Indeed, the Tag-Along Complaints fail to allege any facts demonstrating that the Tag-Along Defendants were ever insiders of Tribune, and utterly fail to explain what relationship, if any, each of the Tag-Along Defendants had to Tribune. The conclusory assertion that each Tag-Along Defendant "was an insider as defined by section 101(31) of the Bankruptcy Code at the time the Transfer occurred *and/or* was arranged" (*see, e.g.*, 13-cv-3736, Doc. No. 21 ¶ 97 (emphasis added)) is clearly insufficient, since "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do[,]" *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

*See also In re Caremerica, Inc.*, 409 B.R. 737, 753 (Bankr. E.D.N.C. 2009) ("The trustee's assertion that the defendants 'are insiders as that term is defined in § 101(31) and used in § 547(b)' is conclusory and insufficient without supporting facts.").[17]

Perhaps recognizing this glaring deficiency, the Trustee argues that the Tag-Along Complaints *imply* that the Tag-Along Defendants were officers of Tribune insomuch as they explain – in a section titled "Zell Induces The FitzSimons Officer Defendants And FitzSimons Subsidiary D&O Defendants To Recommend And Facilitate the LBO" – that "[t]he LBO also triggered enormous 'change of control' severance payments . . . for officers let go after the LBO . . . ." (*See, e.g.*, 13-cv-3736, Doc. No. 21 ¶ 142.) However, paragraph 142 of the Tag-Along Complaints, which appears to refer exclusively to the Defendants named in the *FitzSimons* Complaint, does not mention the Tag-Along Defendants at all. Indeed, it is not clear from the face of the Tag-Along Complaints that the Motion 7 Transfers at issue here are one and the same as the severance payments discussed in paragraph 142. (*See id.* ¶ 141 (explaining that the "*FitzSimons* Officer Defendants . . . all received Success Bonus Payments and/or Phantom Equity Payments[,]" but failing to mention the Tag-Along Defendants at all.) Accordingly,

---

[16] Because the Motion 7 Defendants only moved to dismiss Count 35 with respect to payments made more than ninety days prior to Tribune's bankruptcy filing, Count 35 remains as to Defendant John J. Vitanovec – the only Motion 7 Defendant who was paid on or after September 9, 2008. (*See FitzSimons* Compl., Ex. C.)

[17] Moreover, the Trustee admits in his opposition brief that all of the Tag-Along Defendants were "let go after the LBO" and were therefore no longer insiders when they received the Motion 7 Transfers. (Opp'n at 108 (internal quotations omitted).)

because the Trustee fails to do more than simply restate the elements of a Section 547(b) claim, Count 1 of the Tag-Along Complaints must also be dismissed.[18]

## IV. LEAVE TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." *McCarty v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Nevertheless, "it is within the sound discretion of the [court] to grant or deny leave to amend." *Id.*

Here, the Trustee makes a request to amend in the final section of his opposition brief. (Opp'n at 143–45.) However, as noted in the Court's January 6, 2017 Opinion and Order, the Trustee has not attached a proposed amended complaint, and gives "no clue as to how the complaint's defects would be cured." *Loreley*, 797 F.3d at 190 (internal quotations omitted); *see also Bankr. Trust of Gerard Sillam v. Refco Grp., LLC*, No. 05-cv-10072 (GEL), 2006 WL 2129786, at *5 (noting that Rule 7(b) "generally requires a movant to supply a copy of the proposed amendment . . . so that both the Court and the opposing parties can

understand the exact changes sought." (internal quotation marks omitted)). In other words, the Trustee has "identified no additional facts or legal theories . . . [he] might assert if given leave to amend." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014). Accordingly, the Trustee's request to amend is DENIED.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT the motions of Defendants Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors are GRANTED in their entirety. IT IS FURTHER ORDERED THAT the Motion 6 Defendants' motion to dismiss Count 34 of the *FitzSimons* Complaint and Count 2 of the Tag-Along Complaints is GRANTED. IT IS FURTHER ORDERED THAT the Motion 7 Defendants' motion to dismiss Count 35 of the *FitzSimons* Complaint and Count 1 of the Tag-Along Complaints is also GRANTED.[19]

The Clerk of Court is respectfully directed to terminate the motions pending at: docket numbers 5939, 5938, 5942, 5933, and 5928 in case number 11-md-2296; docket numbers 4460, 4463, 4465, 4542, and 4539 in case number 12-cv-2652; docket number 34 in case number 13-cv-3736; docket numbers 41 and 38 in case number 13-cv-3737; docket number 34 in

---

[18] As with Motion 6, to the extent that the arguments set forth in Motion 7 apply to other, similarly situated defendants who did not join the motion, such as Vincent A. Malcolm, Marc S. Schacher, William P. Shaw, and Joseph A. Young, the Court also dismisses the claims set forth in Count 35 of the *FitzSimons* Complaint and Count 1 of the Tag-Along Complaints against those defendants. *See Wachtler*, 35 F.3d at 82.

[19] As noted above, the Trustee may proceed on Count 35 with respect to Defendant Vitanovec for payments made on or after September 9, 2008.

case number 13-cv-3739; docket number 29 in case number 13-cv-3740; docket number 35 in case number 13-cv-3741; docket numbers 37 and 34 in case number 13-cv-3742; docket number 35 in case number 13-cv-3743; docket number 38 in case number 13-cv-3744; docket number 29 in case number 13-cv-3745; docket numbers 34 and 37 in case number 13-cv-3746; docket number 29 in case number 13-cv-3748; the motion pending at docket number 35 in case number 13-cv-3750; the motion pending at docket number 34 in case number 13-cv-3751; and the motion pending at docket number 34 in 13-cv-3753.  The Clerk of Court is also respectfully directed to terminate Defendant Monsma, the Chandler Trusts, the Foundations, and the Chandler Directors from this action.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: November 30, 2018
       New York, New York

                *       *       *

The Trustee is represented by David M. Zensky of Akin Gump Strauss Hauer & Feld LLP; Jeffrey T. Golenbock of Golenbock Eiseman Assor Bell & Peskoe LLP; and Michael L. Waldman of Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP.

Defendant Monsma is represented by Mark A. Neubauer of Carlton Fields Jorden Burt, LLP.  The Foundations are represented by David C. Bohan and John P. Sieger of Katten Muchin Rosenman LLP.  The Chandler Trusts and the Chandler Directors are represented by Joel A. Feuer, Oscar Garza, and Douglas G. Levin of Gibson, Dunn & Crutcher LLP.  The Motion 6 Defendants are represented by Mark S. Melickian of Sugar Felsenthal Grais and Hammer LLP; George R. Dougherty of Gripp & Elden LLC; and Blake T. Hannafan of Hannafan & Hannafan LTD.  The Motion 7 Defendants are represented by George Dougherty of Grippo & Elden LLC; Michael R. Dockterman of Edwards Wildman Palmer LLP; Mark S. Melickian of Sugar Felsenthal Grais and Hammer LLP; Frances Gecker of Frank Gecker LLP; and Blake T. Hannafan of Hannafan & Hannafan LTD.